Good morning. I think all the counsel at the tables here get the awards for having the most counsel who travels for ARC. Thank you, Your Honor. I want to start by saying I'm arguing the sanctions order today. My co-counsel, some former co-counsel, have yielded their time to me on this issue, but for the Court's edification with me in the courtroom today, obviously myself, Mr. Flynn in the back, Mr. Huntley, Mr. Savalos, and Mr. Stillman, send his regrets that he couldn't make it. May it please the Court. We are here today to ask the Court to vacate the sanctions order entered by Magistrate Judge Bush, sanctioning counsel for what is ultimately a violation of Rule of Professional Conduct 3.3. We're also here to ask the Court relatedly to vacate the monetary component of that sanctions order, awarding fees and costs to the defendants related to their prosecution of the sanctions motion. Reduced to its essence, the sanctions order imposes sanctions against counsel for violating Rule of Professional Conduct 3.3, for failing to correct a prior statement of fact made to the Court, and for not taking reasonable remedial measures to correct that statement of fact. Without the Rule 3.3 violation, there is no predicate act or predicate wrong upon which the Court could invoke its sanctioning authority under 28 U.S.C. 1927 and the Court's inherent powers. So I'm going to focus today primarily on what I believe is the core issue, which is the duty of candor issue and the alleged failure of counsel to live up to counsel's duty of candor. And to give the Court the perspective on it, I think some of the timeline is important, so I want to briefly hit that. This case was initially filed on January 3, 2010. Within a few months of the case being filed, the defendants sought and obtained a discovery stay. Of all discovery, no Rule 26 disclosure obligations had yet been implicated either. Motions to dismiss were promptly filed. We responded, and the case was in limbo for almost a year while we were waiting for the Court to rule on the motions to dismiss. Subsequently, during that time period, I should say, plaintiff's counsel, doing our factual investigation, we learn of what we believe to be a whistleblower witness, Mr. Michael Miller. Mr. Miller is invited to our office. I'm personally present. Mr. Huntley was present there at my office when he gave us a witness statement. We jotted down his witness statement in the form of a draft declaration. Mr. Miller did not sign the draft declaration at that time. Counsel, your time is ticking, and we've read these briefs. Okay, thank you. So the key issue becomes, in our opinion, as we read the magistrate's order, the alleged failure was, on our part, was the failure to inform the Court that Mr. Miller had provided us a signed affidavit or declaration. I think that what he was concerned about is that, and I think he was concerned about the fact that during the interval after your team got this declaration signed, which I'm going to call, and I don't mean to be disparaging, I'm going to call the watered-down version, less inclusive version, it was signed, and there was an interval after that time and before the defendants had it where there were continued representations, including one that he quoted, the judge quoted, that one of the lawyers on your team represented to the Court that the declaration was as good as sworn. That's the interval that I think the judge was concerned about. Thank you, Your Honor. Two points on that. That is the interval in question. I don't believe the good as sworn test, I believe that's the magistrate's characterization of what Mr. Huntley said. It absolutely is the magistrate judge's characterization. That's why I wanted you to have a chance to respond to it. Correct. What Mr. Huntley said when we put the unsigned declaration in front of the magistrate was this unsigned declaration is what Mr. Miller will testify to at a deposition. Okay, and at that time, the counsel made that statement. The signed declaration was already in your back pocket, but the other side didn't have it, right? No. When Mr. Huntley made that representation in Mr. Huntley's affidavit concerning what we believe Mr. Miller would testify to at a deposition, Mr. Huntley made that representation. And to be clear, I'm not saying we're not Mr. Huntley here. We all are on this team. I appreciate that. So it was in connection with seeking a lifting of the discovery stay so we could take the preservation deposition. We did not have the signed affidavit at that time. Okay, so can you talk about the representations you all made to the court, to opposing counsel, after you had the signed affidavit and before they had it? Because that's what's at issue as far as at least just speaking for myself. Sure, and we addressed this in the brief. I believe it's a key issue, Your Honor, and thank you for asking it. The representations were all references to the third allegations derived from Mr. Miller's witness interview, allegations in the third amended complaint. If you look at the record and everything we said in our opposing briefs  the references are all to the allegations in the third amended complaint. Yes, but the third amended complaint was amended in response to this discovery request. The discovery stay, you all requested permission to depose this witness. That permission was not given. Correct. But the unsigned declaration or affidavit was submitted then, right? So it was in the game. The court certainly was aware of it. The representation was this witness, Mr. Miller, would say these things, and I think in good faith you thought he would. I'm not casting aspersions there. And then the complaint was amended, and the complaint by my read incorporates the substance of that unsigned declaration. Is that an unfair read? That is not an unfair read, Your Honor. That's an accurate read. That's the judge's problem, right? That's his concern. At that point you had the signed declaration, the watered-down declaration. I believe we obtained the signed declaration the day after we filed the third amended complaint, Your Honor. But why wasn't there a duty of candor to the court to say this isn't what we thought it was going to be? Thank you for asking. Again, the court issue. First of all, on the third amended complaint issue, the procedural posture was motions to dismiss. We had a good faith basis for the allegations in the third amended complaint. When counsel, any counsel, files a complaint and we know there's going to be motions to dismiss, we are governed by Rule 11, and we always had, no one has ever challenged the fact that we had a good faith basis for those allegations in the third amended complaint. Right, and then the next day you don't anymore. The next day, when the signed declaration shows up, then what? What's your position then, counsel? Position is? About whether the duty of candor to the court was violated. My position, Your Honor, at that point we're still governed by Rule 11 only. Let me ask you this. Would the allegations in the third amended complaint been the same had you had the signed declaration at the time you prepared the third amended complaint? Yes, Your Honor, absolutely. It would have been the same? Yes. Same allegations? Yes. There would have been nothing different? Your Honor, no. Candidly, no. Because I was sitting there with Mr. Miller. He tells me everything. I was sitting there with him. He never recanted that. He never told us subsequently. So I just want to make sure I understood your question. So even if you had had the signed declaration when you were preparing the third amended complaint, would it contain essentially the same allegations? Yes, Your Honor. I believe so. It's a good question, but I — On the theory that what? That he continued to be intimidated and that he would say the full story under oath or what? Yes, Your Honor. He had never — he told us originally, here, I don't want to sign this declaration. I will sit for a deposition, and I believe I'll tell you the exact same things that are in this declaration. I just don't want to do it in an affidavit. I'll do it at deposition. He never recanted that. He never retracted it. We continue to have a good-faith basis. Well, he was deposed, and he didn't. I mean, I appreciate that that's with 20-20 hindsight. But when you say he never recanted, at deposition, his testimony does differ from the unsigned declaration quite markedly, doesn't it? I don't believe so. He's asked specifically by Mr. Flood during the deposition, is the reason why you didn't sign the declaration because you thought anything in there was untrue? And he says — he said no. Or I just read it last night. Mr. Flood's questioning was, is it the reason why you didn't sign the declaration because you thought things in there were untrue, or was it because you were afraid you were going to breach some employment confidentiality obligations, you were afraid of retaliation? He says yes. Well, I think I would — I've read it too. He says a lot of things in there, and I think that there are certainly omissions. That's my read, but I'm taking your time. I have another question. Please. Is your position that the judge, district court, didn't make the findings it needs to impose these penalties, or that the findings aren't supported by the facts? The findings? You mean the penalties or the attorney's fees? Are you distinguishing? I should have said fees. The sanction, the $6,000 sanction. Let's talk about that. That's what I'm trying to get at, because you have this argument about — it's a little different for Mr. Stillman, and I've read carefully what the district court found, and today it sounds like your argument is not that the findings weren't made, but that they weren't supported by the record. Correct. I don't believe the facts underline the merits of the sanctions. I don't believe they're supported. Because you didn't violate your duty of candor, right? Correct. And that goes back to Judge Pius's question, which is even if you'd had the signed declaration, that third amendment complaint would have been the same? Yes. And let me reserve my 10 seconds here. Okay. Just so you could plan your argument, we'll add a minute for additional for your rebuttal. Thank you for the indulgence, Judge Gould. Okay. For the appellee? Yes, Your Honor. Donald Morrow for Appellee Cushman and Wakefield. But in the sanctions appeal, I'll be arguing for all appellees. I think it's important to put in context what plaintiff's counsel told the court when they filed the motion to depose Mr. Miller and attach to Mr. Huntley's affidavit the unsigned Miller declaration. This was a bombshell. They claimed he was a whistleblower-type witness. He was willing to come forward with testimony which would incriminate both Cushman and Credit Suisse of knowingly and intentionally developing and utilizing the misleading and likely illegal total net value appraisal methodology, and that Mr. Miller, quote, is of the opinion that the appraisal methodologies were violative of both FIREA and USPAP. Counsel, I haven't read anything to indicate that those representations were made in bad faith as opposed to the witness flaking out. Well, the bad faith came, Your Honor, when they received the signed declaration, which was materially different and which deleted anything that would support those comments. That's why I keep trying to get everybody to focus on that interval, because things change when the signed declaration showed up. Absolutely. Okay, can you talk about how it is, what happened then that you think was prejudicial and worthy of sanction?  They continue to say in this appeal that there's no material differences. Your Honor, we filed, and it's in the record, we prepared a red line. The red is what Mr. Miller deleted. No, I just asked him if there were material differences, and he agreed with me. There's differences. I've been through the red line. In their briefs, they say they're immaterial. He just got up there and said that they would have alleged the same thing in the Third Amendment complaint, even if they'd had that declaration at the time. Then they would be basing allegations on things that Miller supposedly said to them, but then when he signed a declaration, refused to sign. To me, that creates an inference that that's not true. It's a disturbing record. I'm not trying to make light of it. But if you could, could you respond to opposing counsel's statement that at the time of the deposition, the witness was still, one of the things he said was still that he was not, that at the time he signed the written declaration that it was watered down, my word, my phrase, because of his fear, because he was intimidated. What is your response to that, please? Sure. At his deposition, it was a totally different story. First, Mr. Miller said he had prepared numerous total net value appraisals. Well, having prepared them, certified them all as being compliant with USPAP, that hardly is consistent with someone who is a whistleblower who says there's something wrong with total net value appraisals. He said he saw nothing wrong with reporting the total cash flow as opposed to the market value, if that's what your client asked you to do. So at his deposition, and we asked him, did you go, are you a whistleblower? Absolutely not. Yeah, but the question for me is all when the defendants knew that, right, that he was actually substantively retracting the statement from what he'd made in the very first unsigned declaration, right, as opposed to that signed declaration being a product of intimidation. By the time the deposition, I agree with you, read in its entirety, I think it's pretty clear he's substantively retracting. Yeah. Well, if the question is about his intimidation, at the deposition he testified he wasn't intimidated. He had left Cushman & Wakefield. He had an agreement, you know, a termination agreement. He was worried about violating that. But it wasn't an intimidation issue. That's not the question. The question is that I'm not asking very well, so forgive me, but the question is at the time that the written declaration was given to opposing counsel, the issue is what did they know, what did they think, and did they think that that watered-down version was still a function of the witness feeling intimidated, which is, I think, pretty tough for them to, by the time the deposition rolls around. But, of course, the written declaration, that's a year earlier. So what is your response to that? Well, I think when you submit to the court, first, submitting an unsigned declaration is a little outside the norm. When you submit an unsigned declaration because a witness won't sign it, then you get a signed declaration. So now, obviously, he is willing to sign something, and it's different. Even if it's the same, I think they had an obligation to file it with the court and give it to us. But when it's different and when the witness has deleted substantive allegations that they're relying on, they absolutely had an obligation to submit it to the court and give it to us. That's your conclusion. I'm just asking a slightly different question and wanted to give you a chance to respond to it if you've got one. Please. Okay. And so their position is at that time when they got what I'm calling the watered-down declaration, in good faith, they say, still believed that this witness was willing to ascribe to everything he said in the unsigned version, but that he was giving them only the watered-down version because he was, at that point, intimidated. My answer would be, so what? They filed with the court and have been relying. They continued to rely in the arguments after that point on things he deleted from the unsigned one. Right. And that's what I was trying to get at at the very beginning. After they had the signed one, what happened in the litigation? I mean, I think we have a timeline here in my notes about motions practiced that continued work that was done in reliance on what everybody thought, which was that the unsigned declaration was still going to pan out. Sure. So we had filed our motion to dismiss. After they received the signed declaration, they filed their opposition to the motion to dismiss, where they referred to Miller as a whistleblower. The word whistleblower is not in his declaration. And then they also, there was a motion to strike a, we filed a motion to strike some pleading. I forget what it was. They filed an opposition to that. And in that opposition, they referred to some of the allegations that Miller had deleted in the declaration he had signed, not advising the court, you know, citing the unsigned declaration, not advising the court, or citing the third amended complaint that just repeated them verbatim, not advising the court that the witness now had signed something that did not include that. So if we agree that there is a sanctionable event here, what about relying on the court's inherent powers versus the statute? And, of course, there are different burdens that are required. What do you think we ought to do there? Well, I think both. So under 1927, so on the criminal, or the $6,000 fine, under 1927, I think this court has held that you don't need to go through the procedural safeguards if it's not a serious amount. And this court found in Hanshaw that $5,000 in 1989 dollars was not serious. That would be almost $10,000. It would be more than $10,000 today. The Supreme Court, in the Muniz case, found that $10,000 did not invoke, you know, a fine of $10,000 did not invoke the procedural safeguards. All they were entitled to was notice and an opportunity to be heard. They had that in spades. But you think this is all affirmable under 1927? 1927, and also under the court's inherent power. Well, what about the – there's a comment that part of this is criminal in nature. That's the $6,000. Yeah, they make the argument that the $6,000 is really criminal, and therefore they were entitled to procedural safeguards. Under the Hanshaw case, that argument would fly under the inherent power, but not under 1927. And what about Mr. – is it Stillman? Stillman, yes. Stillman? Yes. What about him? There was a finding that his conduct was at least reckless. Yes. Stillman is the one who drafted the opposition to the motion to dismiss, where he cites things from the Third Amendment complaint, which had been deleted in the signed declaration. And Magistrate Judge Bush took particular umbrage with that, as we did. He had the signed and unsigned, but his explanation is that he hadn't compared the two. But the judge said his conduct was at least reckless. Yes. Is that enough? The conduct that all lawyers engaged in amounted to bad faith. He did. He found that they all were entitled to that. And then he gave the lawyers who felt that they maybe had something to add, to say additionally, an opportunity, and Stillman took advantage of that. He did, as did, I think, the Flood brothers. They were about eight or nine counsel of record. But with Stillman, the magistrate judge said, wait a minute, this doesn't cut it. He let off both floods. So I thought there was a finding of bad faith. There was. Well, wait a minute. That's what I'm trying to get at. I think the judge said at one point, so this is truly, I want to be corrected if I'm wrong, that there was bad faith, and I'm going to call it an umbrella finding. But then as to Mr. Stillman, didn't he say his conduct was at least reckless? It will. So what do we do with that? Well, recklessness can amount to bad faith under the cases, Your Honor, including Ninth Circuit cases. Well, it's just hard to know what, yes, what he meant at that point, whether he was talking about it only being reckless for purposes of the one. Well, I think, I don't want to speak for Magistrate Judge Bush, but it's clear to me that he found that the lawyers who knew that and had reviewed the signed declaration obviously knew it was substantially different from the unsigned one and therefore had an obligation to advise the court of that. And using the unsigned one after that was bad faith. Flood said, we didn't do that, we didn't know. Mr. Stillman kind of said he didn't know, but then the judge, I think, found, well, you had to know because you were drafting the opposition to the motion to dismiss. You cited the unsigned declaration. None of them ever said they didn't get the signed one. They all knew they had it. Well, Mr. Stillman's clear he had it. He hadn't compared it as what his story is. Right. Yeah. All right. Thank you. Thank you, Mr. Morrow. Mr. Conlon, do you have some rebuttal? Thank you, Your Honor. Judge Christin, I want to come back to your question about the interval because I think it goes to the materiality issue. And I want to ask the Court to play it out. Say during that period when we'd filed the Third Amendment complaint and it's just motions to dismiss pending. If we had put in front of the Court the signed affidavit, what is the Court supposed to do with that? The Court cannot legally do anything with that. The Court is bound by the four corners of the complaint under the Rule 12b-6 standards. You could have applied to the Court and said, Look, we just got this signed declaration. We need to reevaluate the Third Amendment complaint. We might want to ask Lee to file a Fourth Amendment complaint to account for the signed declaration. We could have. Oh, you could have. You just could have done that easily. And under those circumstances, it seems like a reasonable thing, a reasonable judge would probably would have said sure. And I understand that, Your Honor. Instead, you don't. We didn't cross our mind. We did not proceed. Oh, no, it didn't cross your mind, but you knew about it. We did not see the allegation to the Third Amendment complaint changed or implicated or recanted by having received the signed declaration. And that's our issue. Because? Because we continue to maintain our Rule 11 basis. We believe Mr. Miller, at that point in time, was going to sit down at a deposition and reaffirm everything he had told us at our witness interview. And if he started to waffle, well, that's grist for the mill at trial. That's what you do. Mr. Morrow wants to draw his inferences. There's equal inferences to draw on the other side, and that's what we have juries for. What's the appropriate standard of review here? Abusive discretion, Your Honor. The backdrop of all this, twice Judge Bush told us during the pleading stage, when we tried to get discovery, he said, I don't want to deal with a tangled morass of legal and factual issues during the pleading stage. And, frankly, that's why I did not think it would be wise to put a signed affidavit in front of the judge during the pleading stage. It would have just appeared, in my opinion, gratuitous. Because the judge had denied permission to depose him? Well, because the judge had said, I don't want to deal with potential factual issues right now. So we go in front of the judge and say, Judge, hey, look at all this. Look at what we just discovered. That's not what, during the pleading stage, I think a trial judge wants to see. I think it reflects poorly on counsel, frankly. Thank you. Thank you, counsel, for your argument. The case of Conant v. Credit Swiss Group, securities shall be submitted, and we thank counsel on both sides for their excellent arguments. Now, we also have to get a little older. My eyesight gets a little worse. But it is Johnson and Land v. Credit Swiss. And for the appellant, we have Robert Huntley. For the appellant and for the appellees, we have David Linder. Well, we welcome all distinguished counsel here today. Please proceed. Now, let me ask this. Are we done with the sanctions issues and now we're on the merits? That's correct, Your Honor. Okay. If I had been a little smarter, I would have put the merits case ahead of the sanctions so to have a deeper understanding. Okay. Go ahead. Robert Huntley for the 68 appellants on the merits summary judgment appeal. May it please the Court and Linder and counsel, I would like to reserve two minutes for rebuttal. I would like to make one fundamental concept clear up front here. The plaintiffs have not brought a direct suit under either FIREE or USPAP. Rather, the causes of action are under torturous interference, negligence and misrepresentation, fraud and negligence, including negligence per se, for the violations of the standards of the conduct required in the industry as articulated by those two statutes. The duty connection urged by the defendant simply does not apply in a torturous interference case. Did you say the duty connection? Is that what you said? They're claiming that they could put this product on the market and that it's a tort claim and we don't have to have any kind of a nexus with them to bring tortuous interference under the case laws, I understand it, and the restatement. I see what you mean. Okay. But as to the other causes of action, it's a little bit closer case. But even there, under the special circumstances of this case, which is very much sui generis, I think, the duty is established under both the Cumas case in Idaho and the Connor case in California. Here we have the defendants and the developers acting in concert to put a toxic product on the market. And they had to know, based on their experience, traded suites, and the number one appraisal firm in the world, practically, they would know that putting this product on, which is over leveraged, which is valuations that are making loans at a ridiculous level, as much as 80% loan market value, that it's going to cause a serious problem about the developers and the resorts being able to survive. Then, on top of that, the Credit Suisse was in on it, on the plan, and Cushman knew what was going on here. These developers were taking money off the top, and normally in the development of a master plan community, when you get a loan, you put the money in to build the facilities to make it viable. And in the case of Lake Las Vegas, $500 million skimmed off the top, went out to the Bass Brothers. In Lake Las Vegas, Gin-Sur-Mer, $333 million went out into some shell corporations. Not a bit of that money went into the development. And therefore, the mortgages were doing great damage to the viability of these corporations. Then, as a result of that, our plaintiffs had interest in the... They had purchase and sale contracts. They had purchases of club memberships. All those things were lost in diminishing value because of the bankruptcies. And the main issues, I think, that are before the court is whether, when a toxic credit facility scheme, which violates USPAP in at least 16 respects, was marketed into commerce by the defendants, that we have a cause and action against them. The trial court committed a reversible error when he based his dismissal primarily on two points. He said there was no evidence of causation and that the sole cause of the bankruptcies was a downturn in the economy. The record disputes that. His ruling that plaintiffs had no testimony contradicting... defense expert, Dr. Taurus, on causation. Taurus's opinion was contradicted by five experts from Collier's, two experts, two reports by Michael Mason, and an eighth report by Larry Leisure. Collier's established that, for purposes of summary judgment, that the downturn in the economy was only 20% of the cause of the bankruptcies. Then you have the rulings of the Montana Judge Kirshner, the bankruptcy judge. They're not preclusion items, but the same evidence that was available to Judge Kirshner was available to us, and is available, and is in the record, and it was there presented before Judge Quackenbush. He totally ignored what those Collier's appraisals... I mean, those Collier's reports said. And you cannot look at this record and say there's no evidence establishing these two positions. That is the sole cause and the reputation of the bankruptcy. There are 24 examples in our completings where the trial judge improperly weighed conflicting evidence on summary judgment, I'm sorry for my voice, rather than resolving all factual conflicts in favor of the non-moving parties. One thing that I would notice in all of the cases, authorities that were put in the defense's briefing, there is not one case they have where you have a consort of people, different individuals and organizations, putting a scheme out onto the market that is a toxic product, it's a predatory lending practice, and it caused the destruction of every one of the 17 entities, master plan communities that engaged in this. They either went into bankruptcy, or they had to get into other proceedings to pull out of it. And total net value has never been used before, to my knowledge, in the United States. It's never been used since. And so I think that not only does our tortious interference cause of action stand, the other one is due too. One thing I would say, and I'm going to save the last two minutes here, I agree there are no cases exactly on point, but the general rule of law that appraisers are not responsible to anybody other than to whom they contract, that's judge-made law. There's no statute to that effect. And the Kumis case and the Collier's case both show where courts have said there are exceptions, especially when the appraiser knew. In this situation, the appraiser was on campus every three months updating their appraisal. The appraisers knew that the amenities and the contracts were very important to these people and that they were not getting anything without them. And so they had to know what they were doing was likely to cause damage, and it surely did. Did you want to keep some powder dry for a rebuttal? I've got a minute and a half, I think.  Okay. For the appellees, we have David Lender. Yes, Your Honor. And is Mr. Scherer also arguing? Yes, Your Honor. And are you both going to argue, or are you? Yes, Your Honor. I'm going to basically take about five minutes or less, and then Mr. Scherer will just, if it's okay with the Court, will just step up and replace me. Of course it's okay with us. Thank you. We're pleased to have you here. Thank you very much. Good morning. May it please the Court, David Lender for the Defending Credit Suisse. Just to give the Court orientation, I'm going to spend my time covering the causation argument, and then Mr. Scherer is going to spend some time talking about the individual claims, which were additional grounds for granting summary judgment. It is undisputed in this case that causation is a required element of each of plaintiff's claims. During discovery, the plaintiffs admitted that the economy impacted the property values, but that they were not competent to opine on causation, and they said that was an issue for experts. And, in fact, during discovery, plaintiff's counsel actually instructed his witnesses not to answer questions about causation, saying that that was an issue for experts. But when it came time to presenting expert testimony, plaintiff's expert did not provide any evidence of causation. In fact, he admitted at his deposition that he did not analyze whether the loans were the cause of the loss of the amenities. He also admitted that he never reviewed the loan terms. He never reviewed the actual sales or the projected sales or any of the relevant data. So without looking at that data, he obviously was not competent to opine on the issue of causation as to whether the developers could have repaid these loans or not or what caused them not being able to do so. And the plaintiffs didn't dispute that during summary judgment, as the court below found. In fact, the plaintiffs never cited to their expert during summary judgment as supposed evidence of creating an issue of fact on causation, so they can't do it for the first time on appeal. That's the Smith v. Marsh case. And even though causation was plaintiff's burden, the defendants actually presented a suite of evidence to show that it was, in fact, the economy and not the loans that caused these issues. We presented expert testimony, developer projections, financial records, credit suite sensitivity analyses, developer testimony, all uniformly saying that the loans would have been paid off, but for this incredible economic crisis that caused sales to drop to basically very low levels. Now, on appeal, for the first time, the two things that Mr. Huntley talked about was the Yellowstone decision and his other expert, Mr. Leisure. And they also actually cite Mr. Miller's affidavit, which was the subject of the last motion. But plaintiffs didn't cite any of those in the summary judgment decision below on the issue of causation. Again, they can't do so now based on Smith. And as you heard, if we were even going to look at this, despite the fact that they didn't raise it below, the Yellowstone decision was based on a different record with different experts. They admit there's no collateral estoppel there. Mr. Miller was not offered as an expert. He was actually not involved in any of the loans that are at issue here or did any of the appraisal work. And in terms of Mr. Leisure, Mr. Leisure also didn't opine on causation. He was actually there to testify about whether the appraisals met the appropriate standards or not. So, essentially, there was no evidence put in by the plaintiffs to dispute our evidence. And they did not show a disputed issue of fact on causation. So because they failed to do so, the Court was correct in granting summary judgment for the defendants. Unless the Court has any questions, I will turn it over to my colleague to talk about the individual claims. Thank you. Any questions from Judge Fizer? We've got no questions. Thank you. Thank you, Your Honors. I'm going to focus on three issues and rest on a brief on the rest. And the three are independently, in addition to whatever, to the finding of lack of causation that Mr. Lender just addressed, the failure of evidence of an element of each of the causes of action that are in this case, the failure of evidence that there was any breach of any contract, which is a predicate for the tortious interference with contract claim, failure of evidence that there was any duty from these defendants that were named in this case to these plaintiffs, as the Court found failure of evidence there, and finally the failure of justifiable reliance on the misrepresentation claims. Putting aside the additional failure that there was any actual misrepresentation made, I just want to focus on the lack of reliance because it's just cleaner. On the tortious interference with contract, what was alleged in the complaint was that the basis for this cause of action was that there were these substantially uniform contracts that promised and entitled these plaintiffs to amenities. When the evidence came out, it became clear that that was all false, that all the contracts either said the exact opposite to the extent they were with the developers. I don't think it's necessary for me to reiterate all of the language that was in block quotes and capitalized. The Court's clearly seen all those. Many of the contracts were not with the developers at all. They were with secondary home purchases and clear they promised nothing and they were silent on the issue. There can be no tortious interference with contract if there is no breach. Everyone acknowledges that. In fact, the plaintiffs here, the appellants here, don't even try to identify contractual provisions that were actually breached and so have waived the issue on appeal. The one last point on that is on appeal they raise an argument that actually was waived because they didn't raise it below, but they'll address it anyway, that this is somehow like an employment at will contract under the Haddell case in the Supreme Court from 1998. Never argued below, so waived. That was a Federal Civil Rights Act claim where there are all these additional public policy protections applicable to those kinds of contracts that have no applicability to real estate contracts. It's also Federal law and the jurisdictions that actually apply here all come out the other way or are silent on the issue. And fundamentally, the claim in that case was that the employment at will contract was terminated. Well, none of the contracts that are alleged to have been interfered with were terminated and they disclaimed any expectancy of any of these rights. So fundamentally, regardless of anything else, there's a failure of proof on that key element and that claim should be affirmed. On negligence, same thing. There's a key element of that claim and a key limitation, as the courts say, on the scope of liability and negligence claims where the harm claimed is economic, such as it is here. It is the scope of the duty. I found it interesting that appellant's counsel cited the Kumis case from the Supreme Court of Idaho. That's our case. That case says very expressly that while USPAT may define the standard of care owed by an appraiser, they do not oppose an affirmative duty of care on an appraiser in favor of a lender who is not a client or designated intended user. It says the opposite of what was argued previously and basically eliminates the duty element. As to all defendants, Credit Suisse and Cushman and Wakefield, the fact that the plaintiffs acknowledged that there was never any communication, no contact whatsoever, no relationship, we were strangers to these plaintiffs until the lawsuit got filed, eliminates the relationship that would be necessary to establish a duty in any event, even were it not for the additional layer of protection that this Kumis case provides. So, again, on the negligence claim, note that fails for lack of duty. On the misrepresentation claims, fraudulent and negligent misrepresentation, again, there is, as we lay out in our briefs, the lack of misrepresentation that could support such a claim. But even beyond that, the lack of reliance is so clear, it just eliminates these causes of action. I'll make the point again that this was not addressed in appellant's opening brief, so it was waived. But even if the court were to focus on it, the plaintiffs all acknowledged that they never read or even received any of the appraisals. The courts have addressed this kind of claim in the past and made it clear that that eliminates any kind of possible reliance. The fact that they make a point that the fact that the district court allowed three of these claims to proceed in the face of a motion to dismiss somehow calls into question the grant of summary judgment. In fact, the opposite is true. What occurred was all of the misrepresentation claims except these three were thrown out at the motion to dismiss stage because those other plaintiffs couldn't even allege reliance. These three, it was more questionable. But the district court made it clear that even in those three cases that the reliance element was, quote, hanging by a thread and invited the defendants to make the motion for summary judgment that we ended up making. This newfound theory, the last point I'll make, this newfound theory of conspiracy, well, conspiracy with the developers. Again, I'll put aside for a second that for the first several years of this case, it was the opposite argument. The argument was that somehow the developers had been duped by the defendants. But even with the late switch that occurred because all the developers testified that, in fact, they weren't duped, they fully understood what was going on, there is no evidence of a conspiracy with the developers. They make no real attempt to establish that. And there's also no evidence that even the developers had the kind of relationship with these plaintiffs that would establish anything other than a contractual buy-sell type relationship. And everyone acknowledges conspiracy is irrelevant for negligence. You can't have a conspiracy to commit negligence. And if there's no breach of contract, it doesn't matter about conspiracy. Thank you, Your Honors. Thank you very much, Mr. Sherr. We have Mr. Huntley coming back, please, for his rebuttal argument. Thank you, Your Honor. I would like to make six quick points of about five seconds each. This one is a little bit – the court was hung up very much, the trial court hung up very much. Change the time to two minutes. Thank you, Your Honor. We're going to give you more than five seconds each. Okay, I'll try to have better diction then. The court was very much impressed with the idea that none of our people had seen the appraisals. That was raised on both rounds of motions to dismiss. And I know it's a different standard there, but it passed the test. And here's why, as an example. A person who's been hit by an airbag that explodes has never seen the mechanism. So when you're talking about torts, our people didn't have to see these appraisals. In fact, they put in their documents that we're not allowed to see these appraisals. People buy at these master plan communities without knowing what Credit Suisse did or what Cushman Wakefield did. And so it's a toxic product. People have a right to rely on the fact that if Credit Suisse, a reputable bank, is doing this, then they're going to do it by the standards in the industry which protect the commons and the value there. Now, on the experts, at one point, they made a Daubert attack on all of our experts. Well, no, the main ones, the Colliers ones. And that was denied. And what Colliers had done is what we call an impact analysis. And I've quoted from that in the briefing, and so I don't think I need to go into in great detail here. Another point is that to refute an expert, you don't necessarily need an expert. If you have other witnesses that give the – I'll use the word – give the lie to what the expert said. And we have plenty of evidence in this record that show that he's wrong in saying that the economy was the only cause. What we have here is fraud and misrepresentation, which Judge Kirshner pointed out in great detail. All of that evidence is available for us at trial. And so to be standing here today and say we have no evidence of causation and no evidence that the downturn in the economy wasn't the only cause is just incorrect. And so this case should be sent back to him, pointing out where he failed to properly use summary judgment rulings and take all inferences in favor of our side. So thank you very much. Thank you, Counsel. We appreciate it. The case of Gibson and Land v. Credit Suisse Group Securities et al. shall be submitted now. Let me just remark at the end that the Court really appreciates all the excellent arguments on both sides of the case from all counsel. This is a hard case, and we can use all the help we can get. The counsel of all has done an excellent job, so thank you. With that, this case shall be submitted, and the Court shall adjourn.
judges: Gould, Paez, Christen